UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEMINI ARTS INITIATIVE, INC., AND BRT POWERHOUSE LLC,<br><br>            PLAINTIFFS,<br><br>-AGAINST-<br><br>THE CITY OF NEW YORK, METROPOLITAN TRANSPORTATION AUTHORITY, AND NEW YORK CITY TRANSIT AUTHORITY,<br><br>            DEFENDANTS. | Case No. _____ |

## COMPLAINT

Plaintiffs Gemini Arts Initiative, Inc. and BRT Powerhouse LLC, by and through their attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, bring this action against Defendants the City of New York, Metropolitan Transportation Authority, and New York City Transit Authority, and for the Complaint allege as follows:

### INTRODUCTION

1.     Plaintiffs Gemini Arts Initiative, Inc. ("Gemini") and BRT Powerhouse LLC (together with Gemini, "Powerhouse") are philanthropic entities that seek to redevelop a site on the heavily polluted Gowanus Canal. Powerhouse plans to transform the property at 322 Third Avenue in Brooklyn (the "Site") into a 170,000-square-foot community arts center that provides space for artists to fabricate their works and for artists and community members to convene. But before the arts center can provide artists with the resources they need most—space to practice their craft, equipment, community, and jobs—Powerhouse first must clean up the toxic contamination on the Site, which is part of one of the most polluted areas in the country.

2.      All of the pollution on the Site occurred when Defendants, the City of New York, the Metropolitan Transportation Authority ("MTA"), and the New York City Transit Authority ("NYC Transit," and collectively with the other Defendants, the "City"), owned, operated, and benefitted from the use of the Site as a means to power New York City's transit lines. The City used the Site as a coal-operated power station, a coal yard, and a switching station to provide electricity to the City's transit lines, resulting in extensive pollution at the Site. The transportation of coal for the power station through the waterways and in underground tunnels, the storage of coal in open pits, and the removal of coal ash from the plant generated even more contaminants on the Site. When structures were no longer in use, they were demolished without any safeguards or protections in place to ensure they did not release further contaminants into the water, air, or soil. And sometimes the City just let the structures sit on the Site to rot and decay, festering with contamination that would one day need to be cleaned up by someone else.

3.      Powerhouse is the "someone else" now cleaning up the mess the City created and left to languish in complete disregard of the environment, human health, and the citizens of New York. Powerhouse already has spent approximately $20 million cleaning up the pollution. And the costs continue to mount.

4.      Because the pollution occurred during the City's ownership and use of the Site, the City bears responsibility for its remediation. Despite its egregious misconduct on this Site and the surrounding properties bordering the Gowanus Canal, however, New York City has not acknowledged this responsibility. For decades, the City neglected to clean up the Site. And despite their clear obligation to pay for costs incurred in remediating the Site, neither New York City, the MTA, nor NYC Transit has covered a single dollar of the cost that Powerhouse has incurred cleaning up the dangerous mess. Unfortunately, this is not out of character: New York

City has misrepresented to the public the status of the Gowanus Canal cleanup, attempted to stymie the Environmental Protection Agency's efforts to push the cleanup forward, and violated its obligations under EPA cleanup orders governing property that the City still owns. Defendants continue to delay the work they have committed to do on the remainder of the Gowanus Canal site, leaving the surrounding community in limbo and putting off the day when New Yorkers can put the pollution of Gowanus behind them. This delay causes continuous harm to the community, depriving it of the cultural and economic benefits of a redeveloped site.

5. As a result of the City's actions, the Site of the former transit power station sat vacant and in disrepair for decades. Then, in 2012, BRT Powerhouse LLC bought the Site. By the time BRT Powerhouse took ownership, the EPA had designated the Gowanus Canal area as a Superfund Site under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") due to the extent of its contamination from the businesses that operated near and on the Gowanus Canal, including Defendants' operations on the Site.

6. Powerhouse is developing the Site into a community arts center that will provide jobs and workspace, revitalize the neighborhood, reinvigorate the community, and stimulate economic growth to the Gowanus region. But the extent of contamination on the Site and the cost of cleaning up the Site have created a major roadblock to realizing Powerhouse's vision. For instance, Powerhouse had to commit to the EPA to removing more than 2,500 tons of soil contaminated with PCBs, where contamination levels reached more than 70 times the permissible limits. The EPA's mandates for cleanup must be met before Powerhouse can proceed with its plan to convert the Brooklyn Rapid Transit Power Station building located on the Site into a new facility that will house fabrication and production facilities in wood, metal, ceramics, textile, and print,

with programming that includes education and public engagement—increasing access and opportunity for all to participate in the arts.

7.  Federal and state law provide that the responsible party should shoulder the costs for the cleanup of the contamination caused during its ownership and use of the Site.  The City is the responsible party.  It is time to hold the City accountable for its deliberate endangerment of the public and for the costs Powerhouse has incurred remediating the Site for the greater public good.

### NATURE OF THE ACTION

8.  This is a civil action for cost recovery and contribution for the cost of cleaning up contamination on the Site of the Brooklyn Rapid Transit Power Station.

9.  On June 26, 2017, Gemini entered into a Consent Order with the EPA under CERCLA Section 106(a) and Section 122(a), 42 U.S.C. §§ 9606, 9622, to perform a removal action and pay response costs in connection with remediation efforts on the Site.  The agreement binds Gemini (1) to perform the work outlined in the Consent Order, including remediation of PCBs and certain other hazardous materials, implementation of a groundwater management plan, and all other actions required by a Remedial Action Work Plan prepared and approved by the EPA and the New York State Department of Environmental Conservation, and (2) to pay all response costs for the EPA as outlined in the agreement.

10.  Under CERCLA, a party that has incurred costs remediating a site may recover from any potentially responsible party who caused, contributed to, or was otherwise responsible at the time of the contamination to the site, including prior owners of a site where hazardous waste was disposed.  CERCLA Section 107(a), 42 U.S.C. § 9607(a)(1-4).  Defendants are responsible parties within the meaning of CERCLA.

11.  Plaintiffs thus bring this action against Defendants under Sections 107(a) and 113(f) of CERCLA, 42 U.S.C. § 9601 *et seq.*, and the New York Environmental Conservation Law, N.Y.

Envtl. Conserv. Law § § 27-1301 *et seq.* ("State Superfund Law"), for recovery of response costs, contribution, attorneys' fees and costs, and other relief, for costs that Plaintiffs have incurred and will incur in connection with remediation of the contamination on the Site.

**PARTIES, JURISDICTION, AND VENUE**

12. Plaintiff Gemini Arts Initiative, Inc. is a New York C-corporation with its principal place of business in Brooklyn, New York.

13. Plaintiff BRT Powerhouse, LLC is a limited liability corporation under Delaware law with its principal place of business in Brooklyn, New York.

14. Defendant City of New York is a New York municipal corporation with its principal place of business in New York City. Defendant New York City is a "person" as defined in 42 U.S.C. § 9601(21).

15. Defendant Metropolitan Transportation Authority ("MTA") is a public benefit corporation chartered by the New York State Legislature under the Metropolitan Transportation Authority Act, NY. Pub. Auth. Law § 1260 *et seq*. Defendant Metropolitan Transportation Authority is a "person" as defined in 42 U.S.C. § 9601(21).

16. Defendant New York City Transit Authority ("NYC Transit") is a public benefit corporation under NY. Pub. Auth. Law § 1200 *et seq*., and a subsidiary of the MTA. Defendant New York City Transit Authority is a "person" as defined in 42 U.S.C. § 9601(21).

17. This Court has subject matter jurisdiction over the claims asserted in this action under CERCLA Section 113(b), 42 U.S.C. § 9613(b), because the controversy arises under 42 U.S.C. § 9601 *et seq.,* and 28 U.S.C. § 1331 (federal question), because the claim seeks to apply and interpret CERCLA.

18. This Court has supplemental jurisdiction over Plaintiffs' state law claim under the State Superfund Law pursuant to 28 U.S.C. § 1367 because it is so related to the federal claim that it forms part of the same case or controversy.

19. Venue is properly vested in this Court under CERCLA § 113(b), 42 U.S.C. § 9613(b), because the Site is located entirely within this District and the harm occurred in this District.

### FACTUAL ALLEGATIONS

**I. The History of the Gowanus Canal and the Site**

20. The Gowanus Canal is a brackish tidal arm of the New York-New Jersey Harbor Estuary that was carved from the tidal Gowanus Creek in the middle of the nineteenth century to serve as an industrial waterway for ships. It is 100 feet wide and extends approximately 1.8 miles through Brooklyn, New York, before emptying into the New York Harbor. It includes four short branches, called "turning basins," that historically had allowed ships to reverse direction.

21. After completion of construction in the late 1860s, the Gowanus Canal became one of the nation's busiest industrial waterways and a main artery of industrial Brooklyn, powering the growth of New York City. By the 1870s, the Canal essentially served as an open sewer, carrying a combination of household waste, storm water run-off, and industrial effluent from the industrial and commercial operations surrounding the Canal. As a result of this run-off and ongoing overflow use, the Gowanus Canal quickly became one of the nation's most contaminated waterways.

22. At the turn of the twentieth century, the Brooklyn Rapid Transit ("BRT") Railroad built a structure on the shores of the Gowanus Canal, called the "BRT Powerhouse" or "Central Power Station," to increase capacity power for the BRT power lines in Brooklyn. The location of the structure—153 2nd Street a/k/a 322 3rd Avenue—made it ideal for a power station engine house.

The structure initially had two parts, a section that served as a "Boiler House" and a section that served as an "Engine House," which contained the steam engine and electrical generators capable of delivering power.

23. An advantage of locating the power station on the Canal was that coal could be delivered to the power station from the Canal and transported from the water to the power station beneath the Site via underground tunnels. Drainage and intake systems were installed below the surface level and operated through a series of underground pipes and structures. The coal was stored in open pits that provided fuel for the plant. The coal ash that remained after the coal was burned was removed from the plant by an electric locomotive capable of moving 125 tons of coal per hour.

24. When the BRT Central Power Station first began operating in 1904, it enabled the BRT and its successors to expand service, build and operate new transit lines, and open new areas of New York City to economic development. The Central Power Station provided electric power to the transit lines through a system of high-tension distribution and rotary converters that could distribute power from a centralized location, enabling the transit lines to spread further and increasing their capability and dependability. To provide this increased functionality, the power station was equipped with several turbines, engines, and boilers. A generating unit and motor generators provided the exciter current for the alternating-current generators. The engine room was accompanied by a two-stack boiler equipped with automatic stokers and a forced-draft system supplied by water pumped in from the Gowanus Canal.

25. The BRT entered receivership in 1919 due to contractual constraints and the financial stress of the First World War. The BRT was released from bankruptcy as the Brooklyn-Manhattan Transit Corporation ("BMT") in 1923. The BMT operated the former BRT transit lines

until June 1, 1940, when Mayor LaGuardia's administration took over the BMT transit lines and the City became the owner and operator of all existing subway and elevated lines in the five boroughs. The New York City Board of Transportation ran the transit lines until 1953, when NYC Transit was created, which then owned and operated the power station on the Site.

26. In 1968, NYC Transit came under the MTA. Throughout the entire period of BRT, BMT, Board of Transportation, NYC Transit, and MTA operation of the BRT Power Station, the trains continued to run and the transit lines operated for passengers without disruption due to nominal change of the operating entity.

27. When the City owned the Site, it demolished structures that were no longer in use, such as the Boiler House and the accompanying smokestack. In that era, demolition was often conducted by hand, without adequate safeguards to prevent the spread of contamination that had accumulated on the Site in the years that it had operated. After demolition, the City re-graded most of the land with fill materials, leaving the remaining structure surrounded by detritus and other abandoned objects, including storage tanks that may have been used to refuel boats on the Canal.

28. During its ownership of the Site, the City also filled the lateral canal that buttressed the Site and the main coal tunnel that had previously been used to transport coal to the engine house from the Canal. The City never decommissioned certain below-grade structures, however, including two lateral discharge tunnels that were used for storing and moving contaminants on the Site. Other structures remained abandoned and in various stages of decay.

29. While certain structures were demolished, the power station continued to provide power to the subways in Brooklyn until 1972. The Engine House building still remains on the Site and is referred to today as the "BRT Powerhouse."

## II. The EPA's Designation of the Gowanus Canal and Surrounding Properties as a Superfund Site

30. Although much of the heavy industry has departed from Gowanus, the ghosts of the Canal refuse to be forgotten; they linger on in the extensive contamination of the Gowanus Canal and its surroundings.

31. In the early 2000s, the EPA identified the Gowanus Canal and its surrounding properties as an area potentially meriting priority treatment for remediation as a result of its extensive pollution and direct proximity to residential neighborhoods. Congress established CERCLA in 1980 as a tool the federal government could use to address the legacy of toxic waste dumping and the profound effect it can have on human health and the environment. The law is commonly known as "Superfund" because, as part of CERCLA, the federal government established a trust fund for cleaning up abandoned or uncontrolled hazardous waste sites.

32. The goals of CERCLA are four-fold: (1) to protect human health and the environment by cleaning up contamination; (2) to make responsible parties pay for cleanup; (3) to involve communities in the Superfund process; and (4) to return Superfund sites to productive and beneficial use.

33. CERCLA equips the EPA with the tools and resources to clean up environmental contamination. It also provides the EPA with the ability to locate the parties responsible for any contamination and to hold them accountable, either by requiring them to perform a cleanup themselves or by reimbursing the cost of cleaning up their contamination.

34. When the EPA undertook an initial assessment of the Gowanus Canal and adjacent properties in the early 2000s, the assessment revealed contamination along the entire canal, including PCBs, volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), pesticides, heavy metals, and other hazardous substances.

35. In 2009, the EPA proposed the Gowanus Canal be added to the National Priorities List under CERCLA Section 105, 42 U.S.C. § 9605, which allows the EPA to establish a long-term remedial action plan to reduce the dangers associated with releases or potential releases of hazardous substances. New York City, one of the industrial polluters on the Gowanus, opposed the designation. Nonetheless, the EPA designated the Gowanus Canal a Superfund Site on the National Priorities List on March 2, 2010.

### III. New York City Has Long Sought to Avoid Its Responsibilities Under CERCLA

36. Despite the Superfund designation, New York City has maintained its resistance to EPA oversight. For years, New York City has stymied the EPA's efforts to ensure the City carries out its obligations under CERCLA.

37. The EPA has long sought to work with New York City to ensure a timely and thorough remediation of the Gowanus Canal and surrounding properties. For instance, New York City is required to clean up and restore the former First Street Turning Basin, to acquire land for and develop retention tanks to control contaminated solids discharges from sewer overflows in the area, to install a replacement force main in the Flushing Tunnel to relocate sewage discharges away from the Canal, to upgrade the Gowanus Pump Station, and to dredge sewage sediment that has accumulated at the head of the Canal. But New York has been reluctant to carry out even the remediation it admits it must do.

38. In 2013, for example, the EPA proposed and signed a Record of Decision for the Gowanus Superfund Site that included the construction of two combined sewer overflow retention tanks ("CSOs"), which the EPA then required the City to design. The CSOs would significantly reduce sewage discharges from two locations in the upper portion of the Canal—discharges New

York City had failed to address in its upgrades to the sewer system. Without these controls, the sewage discharges would continue to contaminate the Canal.

39. New York City dragged its feet on implementing this key portion of the cleanup, however, which effectively delayed the entire cleanup effort. Five years after the Record of Decision, in 2018, the City finally took title to the properties on which it preferred to locate the CSOs, instead of proceeding at the EPA's preferred site on land already owned by New York City. Even then, New York City did not begin work but instead sought permission to scuttle the CSO plan and substitute it with a totally different potential remedy, a sub-grade tunnel. The EPA declined to approve the belated substitute plan, reiterating the remedy it had decided upon nearly six years earlier and noting that the new plan would lead to additional delay of several years.

40. New York City's conduct with respect to the CSOs is but one example of its failure to take responsibility for its historical actions, which caused substantial contamination and resulted in the need for extensive remediation along the Gowanus Canal.

**IV.    Powerhouse's Remediation of the Site**

41. BRT Powerhouse LLC was founded in 2012 to create a community arts center on the Site that will enrich the cultural and economic life of artists and New Yorkers. BRT Powerhouse purchased the Site.

42. In 2019, despite the City's legacy of pollution and neglect at the Site, New York City saw fit to designate the remaining structure, known as the "BRT Powerhouse," as a historic landmark, describing the building as one of the "most prominent, architecturally distinctive and historically significant properties" on the Canal. Unfortunately, the historical significance of the Site was not enough to persuade the City to remediate its decades of pollution.

43. Powerhouse seeks to preserve the iconic building and convert it into a beacon of the arts. Powerhouse's design for the Site includes the renovation of the existing Engine House and the reconstruction of the Boiler House building. These structures will serve as fabrication and production facilities for artists, allowing for flexible workshop configurations, exhibition spaces, and community space for education, research, and collaboration. To make this vision a reality, however, Powerhouse first must remediate the City's contamination of the Site.

44. Although Powerhouse has never contributed to the contamination of the Site, it has made substantial efforts to remediate the contamination. After purchasing the Site, Powerhouse hired an environmental engineering firm to design a remedial plan and oversee remediation work on the Site.

45. During this process, the New York State Department of Environmental Conservation determined that the Site "pose[d] a significant threat to human health and the environment" and selected it for cleanup under the New York State Brownfields Cleanup Program—a program designed to encourage private-sector cleanups of real property that contain contaminants exceeding environmental standards, including sites listed on the EPA's National Priorities List, and to promote redevelopment of areas that have been blighted by such contamination.

46. As part of the Brownfields Cleanup Program, the environmental engineering firm developed a Remedial Action Work Plan to address all environmental issues on the Site and prepare for its redevelopment. The Department of Environmental Conservation approved the Remedial Action Work Plan in the spring of 2014, and Powerhouse hired a contractor that May to promptly begin work on the Site.

47. By June 2014, Powerhouse commenced implementation of the Remedial Action Work Plan by engaging in remediation work on the Site, including work to sample, excavate, and monitor soil, vapor, and water paths on the Site. Among other things, Powerhouse identified and removed PCBs, VOCs, SVOCs, and heavy metals from the Site. An estimated 2,500 tons of PCB-contaminated soil ultimately will need to be transported off-site for licensed disposal.

48. The City's use of the Site caused the contamination that Powerhouse is remediating. During the City's ownership of the Site and operation of the power station, PCBs were widely used in industrial processes, including in electrical, heat transfer, and hydraulic equipment as well as in transformers and capacitors, switches, and voltage regulators. As a result, power plants are a significant source of PCB entry into the environment, with PCBs present in transformers in electrical substations and powerhouses. Subway systems, like the City transit lines, employ PCB transformers for power distribution. Indeed, PCBs were banned as of 1979, meaning any PCB use on the Site occurred before that date.

49. Site investigations have uncovered high levels of PCB contamination associated with the City's use of the Site. According to investigations conducted on the Site, PCB-impacted soil and fill were found under the power station building structure and extending to the west side of the property, sometimes more than 20 feet below grade. PCBs also were found in building materials located in the basement levels of the Engine House and the location of the boiler building on the Site, including in turbine hall sumps, and in and around the lateral tunnels that served as discharge tunnels for the Site.

50. Two different teams of contractors identified numerous environmentally sensitive and contaminated areas on the Site, including (1) an area adjacent to the intake tunnel that transported cooling water to the Site during the City's operation, (2) an area adjacent to the west

side of the gate for the Engine House, (3) an area adjacent to the south side of the gate for the Engine House, (4) an area adjacent to the previous location of the western fence line, (5) a hole within the original excavation footprint on the Site, and (6) an area beneath the historical soil stockpile dating from the City's use of the Site.

51. Substantial amounts of PCBs also were found in and around the underground tunnels on the Site, including:

   a. The area around a coal tunnel, where PCBs were found to have exceeded acceptable limits in both shallow and deep soil testing;

   b. Two lateral condensate tunnels running from the Engine House toward the former 1st Street Turning Basin on the Site, which required excavation of 80 square feet to approximately 19 feet deep. Even at that depth, PCB contamination measured well above acceptable thresholds, and soil from the interior of the lateral tunnel contained PCB contamination at levels *hundreds* of times greater than acceptable exposure limits. To date, 60 to 80 cubic yards of soil have been removed from this portion of the site; and

   c. The former intake structure and former intake tunnel, which were likely used to screen cooling water for the condensers, contained approximately 100 gallons of contamination. Approximately 155 cubic yards of material was excavated to an elevation of 2.5 feet below sea level to remediate PCB contamination.

52. Since June 2014, Gemini has incurred nearly $20 million in fees and expenses for the remediation work conducted.

**V.      Powerhouse's Consent Order with the EPA**

53.     On June 26, 2017, Powerhouse entered into a Consent Order with the EPA under CERCLA Section 106(a) to perform a removal action and pay response costs in connection with remediation efforts on the Site.  The agreement binds Powerhouse to (1) perform work outlined in the settlement agreement, including all actions required by the Remedial Action Work Plan; and (2) pay all "Response Costs" for the EPA as outlined in the agreement.

54.     The Consent Order resolves Powerhouse's liability with respect to the work defined and the response costs it must pay the EPA.  In the agreement, Powerhouse covenanted not to sue or assert any claims or causes of action against the United States, or its contractors or employees, with respect to the work, Response Costs, or settlement agreement, including any claim for reimbursement from federal funding sources.

55.     Powerhouse expressly reserved all rights, including the right to sue for contribution under CERCLA, with respect to any person not a party to the agreement.

56.     The primary polluters consistently have sought to evade responsibility for remediation of the Gowanus Canal site, as New York City did with the CSOs.  As a result, the costs for remediating the Site now have fallen entirely on Powerhouse, which was not responsible for contaminating the Site but has sought to clean it up for the public good.

57.     This cost recovery and contribution action seeks to correct the injustice inflicted by the City's reckless use of the Site and its complete disregard for the environment, the health and safety of New Yorkers, and the costly work Powerhouse has had to undertake to clean up the City's mess.

## COUNT I
## COST RECOVERY UNDER CERCLA § 107(A)

58. Plaintiffs repeat and reallege the above allegations with the same force and effect as if fully stated here.

59. The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

60. There have been releases of "hazardous substances" at the Site within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

61. Gemini and BRT Powerhouse LLC are each a "person" within the meaning of Section 101(21) and 107(a)(4)(B) of CERCLA, 42 U.S.C. §§ 9601(21) and 9607(a)(4)(B).

62. Defendant New York City is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

63. Defendant New York City is a person who operated the Site at the time of disposal of hazardous substances and, therefore, is liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

64. Defendant MTA is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

65. Defendant MTA is a person who operated the Site at the time of disposal of hazardous substances and, therefore, is liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

66. Defendant New York City Transit Authority is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

67. Defendant New York City Transit Authority is a person who operated the Site at the time of disposal of hazardous substances and, therefore, is liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

68. The release of hazardous substances at and from the Site have caused the incurrence of response costs.

69. Powerhouse has incurred, and will continue to incur, necessary costs of response as a result of the releases at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300, within the meaning of Section 101(31) of CERCLA, 42 U.S.C. § 9601(31).

70. Powerhouse has incurred nearly $20 million in such response costs with respect to the Site as of the date of this Complaint and will continue to incur additional response costs in the future.

71. Under Section 113(*l*) of CERCLA, 42 U.S.C. § 9613(*l*), Powerhouse is providing a copy of this Complaint to the Attorney General of the United States and the Administrator of the EPA.

## COUNT II
## CONTRIBUTION UNDER CERCLA § 113(F)

72. Plaintiffs repeat and reallege the above allegations with the same force and effect as if fully stated here.

73. Powerhouse has incurred and will continue to incur liability and necessary costs of response due to releases at the Site for which Defendants are liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

74. The Powerhouse Consent Order is an administrative settlement within the meaning of Section 113(f) of CERCLA, 42 U.S.C. § 9613(f).

75. Powerhouse is a person that has resolved its liability with respect to the United States in an administrative settlement within the meaning of Section 113(f) of CERCLA, 42 U.S.C. § 9613(f)(2).

76. Powerhouse is entitled to contribution under Section 113 of CERCLA, 42 U.S.C. § 9613, from the City for some or all of the liability and response costs incurred and to be incurred in connection with the Site.

77. Under Section 113(*l*) of CERCLA, 42 U.S.C. § 9613(*l*), Powerhouse is providing a copy of this Complaint to the Attorney General of the United States and the Administrator of the EPA.

## COUNT III
## CONTRIBUTION UNDER STATE SUPERFUND LAW

78. Plaintiffs repeat and reallege the above allegations with the same force and effect as if fully stated here.

79. The wastes disposed of by Defendants at the Site constituted or contained "hazardous waste" as defined in the State Superfund Law, N.Y. Envtl. Conserv. Law § 27-1301(1).

80. The Defendants are an "operator" and/or "person[] responsible for disposal of hazardous wastes" at the Site within the meaning of N.Y. Envtl. Conserv. Law § 27-1313(5)(f).

81. Powerhouse has incurred and will continue to incur liability, investigation, and remedial costs and other expenses due to hazardous wastes disposed of at the Site for which Defendants are liable under N.Y. Envtl. Conserv. Law § 27-1313(5)(f).

82. Powerhouse is entitled to contribution from the Defendants for some or all of the liability, investigation and remedial costs, damages, and other expenses it has incurred and will continue to incur due to hazardous wastes at the Site, for which Defendants are responsible. *See Volunteers of Am. of W. New York v. Heinrich*, 90 F. Supp. 2d 252, 257–58 (W.D.N.Y. 2000)

18

("CERCLA does not prevent a plaintiff from recovering damages under state law that are not duplicative of the damages it recovers under CERCLA").

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.  Awarding Powerhouse its response costs incurred to date, together with interest thereon, as well as Powerhouse's future response costs, in accordance with Section 107(a) of CERCLA, 42 U.S.C. § 9607(a);

B.  Awarding Powerhouse its response costs incurred to date, together with interest thereon, as well as Powerhouse's future response costs, in accordance with Section 113(f) of CERCLA, 42 U.S.C. § 9613(f);

C.  Awarding Powerhouse prejudgment interest on all of Powerhouse's past response costs;

D.  Awarding Powerhouse the costs of suit, including reasonable counsel's fees, expert fees, court costs, and other expenses;

E.  Awarding Powerhouse damages in an amount to be determined at trial under the New York State Environmental Conservation Law; and

F.  Awarding all other relief as may be appropriate.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: January 17, 2020
    New York, New York

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:   */s/ Luke Nikas*
Luke Nikas
Ellyde R. Thompson
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Email: lukenikas@quinnemanuel.com
       ellydethompson@quinnemanuel.com

*Attorneys for Plaintiffs Gemini Arts Initiative, Inc. and BRT Powerhouse LLC*